May it please the Court, Jennifer Bennett for the Appellants. For public data to be entitled to Section 230 immunity, all three of the following must be true. First, the claims must impose liability on the company for the exercise of a publisher's traditional editorial functions. Second, public data must not be responsible, even in part, for the creation or the development of the background check reports that it sells. And finally, someone else must have asked public data to sell those background reports on its website. None of these things is true, let alone all three. And I'll start with the last one, whether someone else asked public data to post its background reports on its website. And the reason I'll start with that one is because public data doesn't... Why do you use the word ask in that sentence instead of create? Because you said, did someone else ask public data to post, but the statute doesn't say ask, right? Sure. What the statute says is provided by another information content provider. And so that is actually two requirements embedded in there. The another information content provider, that's the requirement that public data doesn't create or develop, but the provided by part has an intent, essentially, requirement in there. Why is that, and why, if it's got an intent? You said that they ask them to post their data. I guess I'm trying to get to why you take provided by to both require intent, right? And then also, not just to provide it to them, but then ask them to post it. It just seems like you're doing a lot with that word. Sure. And it's because that's what the ordinary meaning of the phrase provided by is. So to take an example from our briefs, for example, if I were to bring cookies to this argument to share with everyone, everyone would say that I had provided those cookies. They were provided by me, even if I had bought them at Kroger's. I'm sorry? You're just tempting us now. I apologize. If I had brought broccoli to this argument, everybody would say that broccoli was provided by me, even if I had bought it at Kroger's on the way here. Better off with the cookies. I'm sorry? Better off with the cookies. But wait. Before you go to the next pages, I want to make sure I understand this part of that though. But wouldn't that also be true if you brought the cookies and you left them in the attorney room? And so every attorney that walks in got a cookie, right? You would have provided those cookies even without knowing who was going to get them. That's right. So we're not suggesting that you have to know specifically who it is. We're suggesting that provided by means you intend to make it available, in this case, on the internet. If you leave them in the lawyer's lines, you intended to make them available to the lawyers who are in there. So it doesn't matter that you don't know the specific lawyers in that instance or you don't know specifically who public data's customers are. But provided by requires some responsibility, some intent to make it available to the group of people, at the very least, to whom it is being provided. And I think you can see that through with the second half of potentially this example, which is... But don't we have cases that interpret at least that language to mean created or developed? And on that issue, you know, from my review of the briefs and the pleadings, it's hard. I mean, as characterized by you, there's some additional work being done. It depends on who you do it. But how do we know whether it's been created or developed from the pleadings? Sure. So I just want to address the first part of your question. There is no case from this court that has addressed this situation of provided by where someone went out and bought information or obtained information from someone else and put it online without being asked to do so. So this court just has never addressed that issue. But to address your created or developed... So you would say... Again, I don't know. I want you to answer this question first. I'll come back to it. Go ahead. Okay. To address the created or developed, public data satisfies both of those words. It only needs to satisfy one and only in part. But we have both here. So on created, the complaint alleges at paragraph 84, which is JA30, that public data creates the background reports it sells. And then it goes on to explain exactly how it does this. This is JA29 through 31. It chooses what data its reports want to contain. So public data has decided we're going to sell background reports. We need to create them. To create these background reports, we need to buy data. So it chooses what data that should be. It then goes out and aggregates the data it buys. It parses it. It summarizes it, including characterizing people's criminal history in ways that don't appear in these records. And then it sells the reports on its website, or rather through its website. It's not like you can go to the website and just get the reports. It transmits it to the specific person who bought it. So in all of those... Well, this is a different context. But in Zoran, which admittedly was, the world was a different place then, there's the discussion about editorial functions, because this is dealing with publications, not dealing with the provided by part. But you have this language about altering content. So how does that language work in with the creative and development parts from the statute, or does it? Sure. So what Zoran, I'm not actually sure how that person pronounced their last name. What that is talking about is taking content from other people. So in that case, it was postings on AOL that AOL's users provided, and altering it in the same way that a publisher provided by something with an author might edit the spelling or something like that. That is a traditional editorial function, taking third-party content and tweaking it before you put it online or in a newspaper. Here, that's quite different from deciding that you are going to create something, and to create that thing, you need to go out and use third-party content to do that. The background check reports here did not exist until public data made them. I think here an analogy might be helpful as well, to take an online analogy. They're not altering content in the sense when they take this third-party information and put it in a form that might be what a publisher would do when they're taking the raw manuscript and working it up so that it will sell? I mean, they are altering, to some extent, the data that they're buying, and they're altering it in order to create reports. So when a publisher is, say, taking a manuscript and making sure there aren't typos, that manuscript exists, it's already been created, and the publisher is making tweaks to it. Here, public data is not taking content, it's not taking something that already exists, it's creating a report, and it's using data to create that report. But isn't that question about, don't we then have to ask about what the statute means by the word information? Because information could be just each component part of that, right? And so in any given, you know, we might think about it in copyright terms, right? There's a work, right? And so maybe it's a different work once you rearrange the information, but it's still the information itself. And if this is analyzed on an information-by-information basis instead of a work-by-work basis, as it looks like the statute suggests, why does it matter whether they move it around or, like, put them together or take them apart? It's the information that matters. Sure. So every court that has considered Section 230 has understood information in this context to mean the content that is online, not any particular bit, because taken to the extreme, you know, any word has been used before, any fact has been used before. But we understand information to have something different than word, right? Like, a single word by itself is not information, but, you know, a sentence might be information. Sure. And particularly in the context of computers and the Internet, the aggregation and the organization and the summary of data has long been understood to be information separate and apart from the individual facts that that organization's summary aggregation contains. And if we think about, you know, for example, the table of contents in—or the table of We bought all of the data that's in there, all of the case names, all of the PIN sites. We bought that from Westlaw. But nobody would say that Westlaw created our table of authorities. Similarly, public data goes out and buys bits of data from all sorts of places, and then it puts it all together and sells it online. And that doesn't— Information. Why don't we think about those as two pieces of information? So your table of contents has two things, right? In this particular case is located at this page PIN site in the Federal Reporter. That information that that case is located there, Westlaw did create that information, right? What you did is you created the information that that site is in your brief. And to the extent the offensive part of the table of contents is that it's in your brief, you created that data. To the extent the offensive part is that it's located on this page, Westlaw created that data. Why don't we break the information apart in that way? It's certainly—there is certainly one way to read the statute. And I think what you're saying is essentially why don't we read the statute to be referring to whatever information means. It means the information at issue in the claim. And so what are you alleging is illegal? And read that way, the thing that's illegal here is the reports as a whole. It's taking—it's selling consumer reports without complying with the requirements of the FCRA. And the Maryland courts, the Texas DMV, the Florida DMV, the private data brokers, wherever it is that public data is buying this data, it's not illegal for any of them to have that information. What's illegal is taking it, aggregating it, and then selling it without complying with the procedures of the FCRA. Can you talk for just a second? Because you're running up, and I want to—so why—you make this argument a little bit, but I want to give you a chance to sort of address. Why don't—why do we think that the FCRA depends on being a speaker at all, right? So this is the sort of idea that, at the end of the day, what they're doing, as you just described, is they're selling this information. And by selling this information, that looks like being a speaker, right? And you seem to argue the contrary to that. Help me understand why they're not the speaker in that context. So the statute says you can't—you have immunity, essentially, for claims that treat the defendant as the publisher or the speaker. And what this court has said in Zarin— But what it—well, sort of, it says that. I mean, what it says is you should not be deemed the speaker. It says you should not be treated as a publisher or speaker. And what—the way Zarin interprets that and the way every court has interpreted that is that liability cannot be imposed for the exercise of traditional publishing functions. And public data doesn't disagree with this. It concedes this on page 21. The question is, are you being held liable for traditional publishing functions? So taking off third-party content, putting on third-party content, or editing things that third parties want to have on your website. None of the claims here require the exercise of traditional publishing functions. They're all about public data's own conduct. What about your fourth count? I think that argument's compelling with, you know, you don't provide the information and notice. I don't remember them all. I apologize. Various noncompliance issues with respect to the Reporting Act. But I think one you have about the accuracy of the information. Does the accuracy information—is that a weak point in the argument you're making now? So I will certainly say that that fourth claim is more difficult, but I want to clarify the fourth claim. The duty imposed by the FCRA is not that the information be accurate. The duty is that the consumer reporting agency adopt reasonable procedures. And so those reasonable procedures do not require publishing anything, not publishing anything, editing anything. If it's a procedural setting up processes that may have their goal to be accuracy, it's not a content-based claim? That's exactly right. The claim—the duty imposed—you know, you can sell— if you sell inaccurate consumer information, but you had reasonable procedures, you are not liable under the FCRA. So this is, in fact, very similar to the HomeAway case, where it is—one way that public data could prevent itself from ever suffering these claims is to not publish inaccurate information. But another way is just adopt back-end procedures that have nothing to do with what actually ends up on its website, but to satisfy the procedural requirements to ensure where the data— the private request for data to dates of birth. Things like that that are all back-end procedures just as in HomeAway that have nothing to do with what actually is published. Your argument is that, at least for the first three counts, arguably for the fourth count, public data could do exactly what it does now without any impingement on, for lack of a better word, what it publishes, what it speaks, because compliance with FCRA doesn't affect that, that those are extraneous. That's exactly right. The FCRA imposes no requirements on what it publishes or what it speaks. It imposes procedural requirements that require it to, for example, provide notice to certain people to adopt certain procedures on the back-end, that kind of thing. Do we think—can you help me understand a little bit how transunion plays there, right, where the court says that if you're not speaking—this is the standing case by Justice Kavanaugh— that where you're not speaking, you don't have a claim because you don't have Article III standing, right? So, in other words, if your report wasn't conveyed, that's a case where they had the reports, transunion was sending them out with the terrorist watch list information, right, and so for the people who were spoken, so in other words, their reports were sent out, they had standing, but the people that weren't sent out, right, there was no speaking that happened, they lacked Article III standing. Can you help me understand, does that not suggest to us that the FCRA really depends upon the, you know, in this case, you know, public being a speaker? I think there are three separate answers to that, and I want to tease them out quickly. So the first is, I think what you're saying is essentially publication is a but-for cause of the claims. Absent some sort of publication, the claims couldn't exist, but that was true in HomeAway, it was true in this court's decision in Erie, it's true in Dovey Internet Brands, and what courts have said is just because it's a but-for cause of the claims, that's not enough under Section 230. Publication is going to be a but-for cause of virtually any claim that occurs about conduct that occurs related to the Internet. And what the question is, as this court said in Zarin, is is the claim trying to hold the defendant liable for traditional publishing and editorial functions? And here, that's just not the case. The FCRA isn't trying to do that. Make your other two points as quickly as you can, because you're over and you've got a lot of other folks to hear from. Sure. So briefly, the other two points is related to that. You know, the reason publication is involved here at all is because that's the only way you can transmit data. Just as a technical matter, the only way you can transmit consumer information, the only way to sell it is technically to have a publication occur. There's no reason to believe that Section 230, when it refers to publisher, which we're supposed to interpret with its ordinary meaning, meant to include this hyper-technical requirement that just is necessary as a part of selling information. And the third thing is just to note that the traditional publishing functions are all about choosing to publish or not publish or edit content that someone else has asked you to publish. And that is not true here. Here, we're talking entirely about public data's own speech, its own choice to publish. I'll save the rest of my time for rebuttal. Thank you. All right. Thank you. Mr. Highfield, on behalf of the states. May it please the Court. Perhaps the most straightforward way for the Court to resolve this case is to focus on one of those arguments that counsel was just making, namely that the plaintiffs' claims don't treat public data as the speaker or publisher of third-party information, so Section 230c.1 provides public data no protection. Instead, what the plaintiffs do is they seek to hold public data accountable for public data's own allegedly wrongful affirmative acts and omissions, things like not obtaining the required certifications, before furnishing consumer reports, not informing a consumer when a report has been furnished, and not maintaining procedures designed to ensure accurate reporting. Those obligations are imposed by the SCRA on public data by virtue of public data choosing to operate as a consumer reporting agency. Those obligations don't come from the content of particular reports, and as counsel was arguing, they don't involve traditional editorial functions. So that makes this case much less like a prototypical Section 230 case, like Zarin, for example, and more like Erie Insurance v. Amazon, where this Court held that Section 230 did not apply even though Amazon published a product listing, and even though that publication was a but-for cause of the plaintiffs' injuries, Section 230 still didn't apply because the plaintiffs' claims weren't trying to hold Amazon accountable as a publisher, but rather as the provider of an effective product. So can you give me some insight into TransUnion then, right? Because TransUnion seems to suggest, it reserves in one footnote whether it really means this, but it seems to suggest that it is the speaking that is the... that causes the violation, at least for Article III purposes, maybe not for statutory purposes, of the FCRA. Why should I... Why doesn't that undercut what you're suggesting? So two responses, Your Honor. First, my understanding is that standing for the class plaintiffs, at least in this case, comes from potential... potential harm in the future, an underspoken... No, no, yeah, I get that. I don't have a standing concern, right? What I have is, you know, TransUnion,  is the publishing, right? So that's what's occurring. And if you're not published, then you have no injury. And that suggests to me that you haven't violated the FCRA. That's what I'm trying to get at. So, Your Honor, to be clear, public data is performing a publishing function in the sense that they are providing these consumer reports. They're putting them together, they're publishing them, they're providing them. So they are functioning as a publisher. The question is whether these specific claims that the plaintiffs are making are attempting to hold them responsible for the publication functions and for the traditional editorial functions that goes into being a publisher. So we would agree that public data is publishing information, but the nature of these specific claims is holding them responsible for procedural violations of the FCRA, not for the content of a particular report. That sounds a little bit like, you know, you would be covered, but you're accepted because of the Fair Debt or the Credit Reporting Act. And if... And so what's your response to the argument that the statute 230 has expressed exceptions, but this claim isn't one of them? So, Your Honor, we agree that there is no per se exception for FCRA claims, unlike some of the claims that Your Honor is referring to. But we wouldn't expect Congress, because of Section 230's broad reach, to specify each type of exception. So instead, we focus on the language of Section 230c-1... Don't you have to say that you don't qualify in the first place, therefore you don't need an exception? Or is that... Is that your argument? Yes, Your Honor. Our argument is that under the plain language of Section 230c-1, that protection that Section 230 offers is not available for this defendant for these particular claims. But we're not making a broader argument that there's some kind of per se exception for FCRA claims. And I'd like to call the Court's attention to one other instructive case here, and that's NRA Facebook, a recent decision from the Texas Supreme Court. There, the Court held that the plaintiff's claims under a Texas statute that prohibits contributing to human trafficking could proceed, and that they were not barred by Section 230, because those claims sought to hold Facebook accountable not as a speaker or publisher, but for its own affirmative acts that encouraged human trafficking. Can I ask, with Judge Agee's indulgence, can I ask a question? If we agreed with you on C-1, don't we also have to address C-2, because that's an alternative theory of immunity, using that term loosely? Is that... Am I fair in saying that? Even if we agree on C-1, it doesn't apply to FCA in the context for exactly the reasons you give. We still have to turn around and deal with C-2, right? In theory, Your Honor, but here there's no claim that turns on restricting access to information or providing tools to restrict access to information. And so, yes, in theory, one would run through all the provisions of Section 230, but none of those provisions is going to apply to public data in this context. All right, thank you very much, Mr. Hiefel. Mr. Metzler. Thank you. Good afternoon, Your Honors, and may it please the Court, Jack Metzler for the Federal Trade Commission. I'd like to start by thanking the Court for allowing me to argue here today. We asked to be here to underscore that the stakes in this case go beyond these defendants and this plaintiff. The Court's decision will directly impact the government's ability to enforce the Fair Credit Reporting Act nationwide. Can I ask you a quick question before you get started, since you paused? Don't ever pause if you want to keep going. So can the FTC enforce the FCRA in the absence of any publishing? So if a company said, as a matter, we're going to engage in this, you know, credit reporting agency work, and for this class of people, we're going to do this, but this other class, we're just starting up, and we haven't actually published anybody yet. But the FTC said, well, you're still violating the rule, because as a status, you're a federal credit reporting agency, you haven't sent anything out yet, but we see that you don't have the protections under, you know, the accuracy of information. And can the FTC then bring an action in the absence of publishing? Yes, Your Honor. And your question anticipated where I was going anyway. It's nice of you to say whether it's true or not. So the... Under the Fair Credit Reporting Act, a company becomes a consumer reporting agency when they meet the definition in the statute. And the definition is whether they are regularly engaged in the practice of gathering information about consumers in order to provide consumer reports to third parties. So it matters that they are gathering the information. That's when they become subject to the Fair Credit Reporting Act. And that's before they've necessarily provided any... before they've provided any reports to anyone. So without having done any publishing activity. Now, some of the claims, not all of them, but some of them sort of depend on there having been, at some point, a report provided. But we argue that the claims in this case don't... they don't depend on any publication, and for that reason, they don't treat the defendant as a publisher or speaker. Is that... I'm just... I hear you, I guess, on that, but I'm really focused on count four. Because, I mean, the other three seem to me to be discreet enough and really unrelated to content. And I certainly understand that, you know, count four is at least technically about procedures to ensure accuracy. But as a practical matter, does that ever... I mean, it's one thing to say, in ERIE, you wouldn't have been sued for product liability, but for having your website. It's another to say... that applies almost to anyone on the Internet. But this count four, you know, you're not going to be pursued for failure to have quality control procedures if the content isn't bad in the first place. That's the claim that I'm struggling with, because it seems closer connected to accurate or inaccurate content than any of the other claims. I hear you, Your Honor, but I think the conclusion that it does not involve publishing flows directly from what Congress decided to do when it entered the... when it undertook to regulate consumer reporting. It recognized that this is an important function. If you are extending credit, you are entitled to know, and it's important information to know what somebody's credit history is. But what Congress said is, if you're going to enter the business of providing this information, you have to do it responsibly. And that's why the Fair Credit Reporting Act, in that count and in the others, doesn't impose liability for false reporting. It imposes liability for not following the procedures. But to your question, your specific question, if you can imagine a consumer reporting agency that doesn't do any of this stuff. They just take whatever they find, and they put it online, they provide reports. Maybe it's true, maybe it's false. If we bring an action against them, it's not an element for us to show that they ever provided any false information. Now, it could be that they lucked out, and everything they provided is true. It doesn't matter. They're still liable under the Act because they didn't invoke the procedures. Has that ever been prosecuted or enforced? Well, your Honor, it wouldn't come up. If it turned out that... I'm not saying it wouldn't come up because they would all be false. I'm saying it wouldn't come up because we wouldn't have to prove it. They would come up and say, you can't show that any of our reports are false. And we would say, well, we don't have to. That is not an element. That's not what makes you a consumer reporting agency. It's not what makes you subject to the requirements of the Fair Credit Reporting Act. And we don't have to show that to show that you violated it. Now, in practice, it often turns out that a lot of... Mr. Messler, you're beyond time. Is there something you want to tell us very quickly? Um, well, my final point would be, uh, just to return to where I started. The, uh... we hope to underscore that the stakes in this case go well beyond these plaintiffs and that, under the district court's opinion, it would severely hamper our ability to enforce the Fair Credit Reporting Act nationwide. Thank you. All right, thank you. Tell us how you pronounce your name so we try to get this right. Misha Saitlin for... Saitlin. Saitlin for Public Data. All right. If plaintiffs prevail in this appeal, Section 230 of the CVA would not prohibit states from, uh, enacting laws that would effectively close down any, uh, website that would have the temerity to publish hard-to-find public records online in an online searchable database. Now, my... If we had a... not a probably unrealistic hypothetical, but let's say public data for its own purposes was distrustful of the, uh, Internet, and so it decided to go old school with its business, and so if you wanted to obtain the consumer reports from public data, they would only send it to you by mail or FedEx or you'd have to drop by and pick it up. If that were the case, then you wouldn't have a 230 argument, would you? Two things, Your Honor. One, we do not create consumer reports, not at all. All we do is have an online searchable database. We do not create any consumer reports, but with that... Let's assume it could be construed as a consumer report at that point. Yes, Your Honor. Section 230 is about a free, robust, open Internet. It doesn't solve all the problems of the brick-and-mortar world that were before the Internet. So, yes, we're focused on the Internet. Now, Your Honor, my friend... If you did part of your business by Internet and part of your business by U.S. mail, then you'd have a different argument for the U.S. mail part. Right, Your Honor. Just like if, you know, Facebook started Facebook in person and then had people come and speak at Facebook forums, you know, just like the way that, you know, certainly some of the same speeches could be made that would be posted by folks on Facebook, but Section 230 wouldn't apply to a Facebook in-person forum. But, um, just, Your Honor, my friend... My friend for the plaintiff started with three reasons that she thought that we should lose. And I would... And they were, one, this argument about is provided by a third party on purpose for a publication. Two, this argument that some of my other friends focused on about the, um, claim by claim and that it's a regulation not on speech. And third is because there are specific allegations that we dealt... that we, in fact, created this content. And I would urge Your Honors to going on any of those first two grounds will be truly dangerous to the internet. Because if Your Honors rules on those two grounds, then if the, uh... if a website like Google Scholar creates an online searchable database and a state imposes a vast array of regulations for them publishing that online database, then, um, Section 230 would have nothing to say about that. But we have... Hadn't we, in this circuit, at least already crossed the Rubicon a little bit with the Erie case? Because the Erie case says that we... What's important is the content of the information. Is that what... Is that the subject matter of the claim? And, you know, we had a publication, you know, in that case, and because the claim was product liability in nature, you know, what we said already is that's not about the content of what was put on the internet. And so, you know, whether that's good or bad or damaging to the internet or not, that's Fourth Circuit precedent. So how does that not pretty much eliminate claims 1, 2, and 3 and maybe have us, you know, a robust discussion about 4? Absolutely. I very strongly disagree. The gravamen of the claim in Erie was that defective products were sold online. The gravamen of the claim here is that we published an online database. And I would urge Your Honour to just really think about the consequences of their argument. Imagine if a state, say Virginia, passed a code of regulations that said any time anybody tweets online that Twitter then has to send information about that... tweets about an individual person online. Twitter has to send to that individual person every tweet that's ever been tweeted by them online about anything. And Twitter also has to do X, Y, and Z, basically created a code of regulations on Twitter for having the temerity to allow... to publishing that tweet. If their argument is accepted, then Section 230 would not apply to Twitter in that circumstance. Because, of course, what they're doing here is they're saying, if you want to be a publisher, if you want to be a publisher, if their understanding of the FCRA is correct... 230 is about... is, you know... is you're not treated as a publisher with respect to information provided by another. I mean, you're talking about someone's tweets. Maybe I didn't follow your hypothetical, so I'm sorry if I missed some of that. But, I mean, I don't think that... Maybe you did. Maybe that example involved, hypothetically, information provided by others, but it didn't seem to. Or maybe I missed that. Right, Your Honor. What I'm trying to say is that the argument that Your Honor mentioned was compelling is truly dangerous and could be used against Twitter, against Facebook, against AOL. This different argument that, in fact, we created the content or whatever, that's an argument that I'm happy to talk about, and I think we're right on the best reading of the complaint. But the argument that Your Honor said was compelling is truly, truly dangerous to the Internet. It would be an extreme position to say that whether it's the federal government or even more dangerous to the states, that if someone publishes an online searchable database, which is all we do, we publish an online searchable database, that a state could impose any regulations it wants on the actor that publishes any bells and whistles and special onerous conditions for the right to publish an online searchable database. Let's go back to what I understood Judge Quattlebaum's question to be, maybe incorrectly. Why is this case different from the Erie insurance case? Because the gravamen of that case, that claim there, was that Amazon was selling a defective product on its Internet, on its website, and the publication was incentive. Here, the gravamen of the claim is that we publish an online searchable database, and their incorrect understanding of the FCRA means that in order to publish an online searchable database of public records in this country, you must comply with a whole suite of onerous requirements. If that is true, that any state could enact an even more onerous suite of requirements on any company just for publishing public records in an online searchable database. The first three counts, though, you could publish, using that word, exactly what you have now, but you'd only have to follow the Fair Credit Reporting Act for things that are not part of the publication. The content of what you put out there would not have to change. Let me... Okay, let me explain this. Let's focus on the second claim, the 16.81k claim. What that claim is saying is that when we sent out certain... When we allowed people to search on our website, employers, we should have sent the consumers a notification that somebody was clicking search on our website every time. If that is the basis of this court's ruling, then a state could enact a statute that says any time somebody tweets about anyone, that Twitter has to send that person a notification. Somebody has tweeted about you, and they have to find that person's email, send it out to that person. That would be the exact analog to what they're saying here. And if Your Honor accepts that reasoning, says, well, look, Twitter would still allow the posting of the same tweet, they just have to find the individual person after the tweet is sent... I don't do Twitter, so I'm at a disadvantage here, but isn't what happens there a third person puts this tweet on their platform and it goes out? I mean, it's not... It's not something that Twitter goes out and solicits or refines once it comes in, is it? That's exactly, Your Honor. That's why I'm very strongly urging Your Honors not to rule on their favor on this argument, because it would apply to Twitter. I'm happy to talk about that argument about the third parties and whether it's changed. Now, with regard to the third... Would this apply to Twitter? Because just focusing on the argument about the content of the tweet wouldn't change, or if Your Honor doesn't use Twitter, a message board, perhaps. If the court is going... If the court is going to hold that as long as the publisher doesn't have to change what is actually published on their website, whether it's somebody else's message or tweet or whether it's, you know, a public record that's already public that we find, then that would necessarily apply regardless of how the information was obtained. So I strongly urge that if Your Honors are skeptical of some of our arguments to focus on the later argument, the argument about whether we, in fact, created the information. Because if Your Honors go on that, on that argument that we have been discussing, the implications of the... In your example, maybe you've moved on from this, but in your example, the Twitter platform didn't create that argument. It just appeared from outside somewhere else, right? That's exactly right, Your Honor, and that then moves us away from this issue that we've been discussing here and on the other arguments in the case. Now, with regard to that, they have two points.  and not asked us to publish it. And second, that we, in fact, created this information. So just addressing those arguments in turn. The argument that it has to be provided to a third party that wanted us to publish it and it can't be done by an intermediary that we paid, that is contrary to the Ezra v. America Online case, which is the only appellate court to have dealt with this issue. There, America Online was sending runners out to get stock information, and the Tenth Circuit held that even though AOL was sending out those runners to get that stock information obtained from third parties, that was protected by Section 230. We think that decision was correct and it would create a circuit split. But in that case, AOL didn't change any of the information that came from the stock sources, did they? That's right, Your Honor. So this is very important. So if Your Honors should not go on that first major argument we were discussing and should not go on this argument, But the plaintiffs say you do change the information. Your Honor, in my respectful submission, that is really the only difficult issue in this case because in their complaint, they falsely allege, depending on how one reads their complaint, that we make some sort of significant alterations. In fact, and I think their complaint is... That may be a false accusation, but we're not at summary judgment here, right? This is just judgment on the pleading, so we have to accept what their pleading says, right? And if this court rules that we're right on those other two arguments, you know, for the reasons we discussed, and sends back for a limited discovery on this last issue, the allegations in their complaint will be proven flagrantly false. All we do... Can I ask you a question? So I understood in part that the alteration or change that was being made was not to the underlying information, but was in fact to the linking of information. So in other words, taking five different arrest records, right, that might have the same name, and linking them together. And the information in each record that you're not changing, but by virtue of linking them together, that linkage was new information, right? You've now added that piece. And why is that not creating the linkage information? Well, that's just not what we do, Your Honor. All we do is go to the courthouse, take the information, put it into a more reasonable... We think that that's the best way to read the Second Amendment complaint. But if Your Honors disagree with that, read that Second Amendment complaint differently, send it back to the lower court. It will be quickly proven up. All we are is an online search engine of hard-to-find public records. That's all we are. There are policy considerations that some of the states, the FTC, might have about some other folks. All we do is go find hard-to-find public records... I got my earlier question correct, that whatever's in that complaint, at this stage, we have to take as true. Do you agree with that? With all reasonable inferences, that's right, Your Honor. But again, there are three arguments before you, Your Honors, that my friends have fronted. Two of them are bright-line hammers, and hammers that would take a hammer to Section 230 and the Internet. So would your argument about... ...the role of C-1 in terms of whether you treat someone as a publisher... If someone has a, you know, contractual non-disclosure agreement, and one party, you know, violates that by disclosing rather than, you know, just telling someone by an Internet post, would that... would C-1 provide protection for you? While those are not the facts of this case, the case that decided the most analogous issue to this is AccuSearch out of the Tenth Circuit. And what the Tenth Circuit held is that when you take private information, confidential information, and you make it public, that transforms the nature of the information. You become the content provider. What we do here is we take public records... That's... that's... let me just... My question, though, is in that situation, you're being sued for breach of a contract. And the methodology that you may have breached it, rather than going to... out on the street and, you know, and talking about it, rather than writing a, you know, letter to the editor of a newspaper, you elected to provide the information that you contractually agreed not to disclose via the Internet. And is it your argument that in that situation, you know, not counting the other issues we've talked about, like who created it or not, that you get a... you know, you get a complete protection by 230 because you elected to violate your contract on the Internet? 230 does not have any sort of bright-line exception for contractual claims. It has other exceptions. So would it... would it provide protection? It would not, Your Honor, because under the AccuSearch case, you're converting private information to public information, and that is... that is creation or at least development of content. So in that circumstance... Why would we think that's creation or development of content? I understand you've got a Tenth Circuit case that says it, but that doesn't make any sense. Like, why... why do we... That's not creating information, right? That's just changing the forum in which it is hosted. That's what you do, right? You're taking information that's not otherwise accessible, right, that a police station has or whatever, and you're making it public. No, it's... Everything we do is public records that citizens have the legal right to have access to. No, I didn't go yet. All right, that's fine. But the point is, like, I don't understand why... I mean, I'm just disagreeing with AccuSearch, I guess, but I don't understand why that would make a difference. Your Honor, we're comfortable with AccuSearch. We think their point that... that private... that private information that is confidentially getting transformed public, that that changes the information. Now, certainly there could be... could be credible arguments to the contrary, and if that case came before Your Honors, maybe there would be a... create a circuit split with AccuSearch and, you know, they could go up to the Supreme Court or whatever, but we don't need to... we don't need to eat that here. Only thing that we're saying is if you have an online searchable database of already public records and all you're doing is putting that into a nicer-to-read format, that's core Section 230. That is... that is core to what the kind of free, open Internet that Section 230 protects. If we... Can I ask a different question, just to make sure I understand? If we... let's assume we, just hypothetically, took your advice and said, yeah, maybe the complaint's close enough, and so we're going to send the C1 question back on what you actually do, all right, as opposed to what they allege you do, do we also have to address your C2 argument? I don't believe that we made a C2 argument in this case. Okay, that's what I'm trying to... I want to make sure I'm understanding. So you have not alleged that you have any protection under C2? That's right, Your Honor. Now, just to be clear, they do have these two other bright-line arguments, which I've been repeatedly saying are dangerous. We won on those below. So if Your Honor reversed just on the is the complaint close enough issue, obviously we won on those, and the only thing that will be for the district court on remand will be to determine whether they're telling the truth in their complaint or not, which they're clearly not. Can I go back and ask just one more... sorry, they're just narrow questions, but it sort of helps me frame where we are. Like, are you a consumer reporting agency? Absolutely not. Absolutely not, Your Honor. Your position is that you are not. We are a simple conduit. We do not match credit... That question, you're not conceding that here, but for our purposes, that question would only be decided on remand, right? They've alleged that you're a consumer reporting agency, right? So don't we have to accept that for this position? I understand you're going to argue about it, but don't we have to accept that you're a consumer reporting agency? No, I mean, that's a legal conclusion. Obviously, one doesn't have to accept it, but that's not the issue, because Section 230 is an issue of immunity. We brought that defense first. But, of course, their conclusory allegation that we are a consumer reporting agency is not something that can be... Just tell me briefly, if you can, why you believe that you are not a consumer reporting agency, because in many ways, you seem to look like one. Well, Your Honor, we really, really are not. Under 15 U.S.C. 16 81A, you have to be in the practice of assembling or evaluating consumer credit information. That every court and FTC guidance is that you need to be evaluating and getting specific individuals. What happens here is you go to our website, you type in... I understand what you've alleged you're doing, but why isn't that assembling? Like, you're assembling it. It has to be on specific individuals. Like, if somebody goes... It's an open text search. It's an open text query. If somebody goes on our database... They're still assembling the information, right? So you go out and buy this information. You put it in a searchable database, right? I mean, I understand that. That looks a lot like the word assembling. The way that courts and the FTC have interpreted that phrase is that a mere conduit, you know, putting together information that's available elsewhere and just putting it out there, is not sufficient to make you a consumer reporting agency. And what is the... Do you have a site and or... What do you tell me to look at to have this idea that a mere conduit who assembles records is not sufficient? Well, the cases that we cited in our brief are the Gianni v. Stern case. And I can read the sites off to you. No, no, you don't have to. Just give me the name. If they're in the briefs... Yeah, they're all in the briefs. We say we're a mere conduit. And the FTC piece is also in there. They're regulation or guidance. I don't know that standing here whether their interpretation that mere conduits are not a consumer reporting agency. Is that the only... And I don't want to take up all your time, but is that the argument why you're not? Is that because you're not assembling because of what you do doesn't count as assembling? That's exactly right. We're not assembling or evaluating information on specific individuals. Right. I got evaluating, but assembling is the piece. But the cases you've got in the brief are the best we got to look at. That's right, Your Honor. But of course, the court that issue has not been fully briefed, Your Honor. Obviously, we cited those cases in our brief. But it also just must be so. Because if someone creates an online open text searchable database, if someone types in, say they want to they're considering hiring somebody named John Smith. They type that into our online search database within the Maryland courts, they're probably going to get 50, 70, 100 results for John Smith. We don't purport like a consumer reporting agency to tell you this is John Q. Smith that was born on such and such a date and therefore this is his credit report. Now, if you happen to type in my name, you're probably not going to get too many other results in Maryland. Hopefully no results in Maryland. So we are open text search. And if you look at footnote 37 of roommates, for example, the Ninth Circuit in taking, I think, generally a narrower view than this court has taken to section 230 says an open text search of a website is not development or creation. And that's really what all our website does. Now, they say they want to read their Second Amendment complaint a different way. We think that the district court read it correctly. But again, if your honor has ruled for us on the other issues, we're quite happy to go below and prove up what we have said. That we don't... But this question of whether you're a consumer reporting agency... I'm having a little bit of trouble figuring out whether we have to answer that question or not. Or given the posture, don't we assume that you are, not decide, but assume that you are and then address your 230 arguments? Or are you saying that we've got to address that as a separate... I... We have to either assume that there's a cause of action against you or not, right? And if you're not a consumer reporting agency, then the claims fall on the merits, not on 230 grounds. The way that I would say it is your honors have to assume the hypothetical statute that they're arguing, which is the FCRA makes it illegal for a... Do what you do. To do... To create an online database of already public records that are searchable. You have to assume that the FCRA... We don't have to decide. Right. And I think it's very important that your honors say do not decide that because that is a very strong argument we would have and if we unfortunately were to not prevail in this case and we strongly hope that we do, we would certainly make that argument. So, if, for instance, we decided that we didn't agree with the majority opinion in AccuSearch, but we're more inclined to take the concurrences approach, tell us why that's wrong. Well, as I said, we are quite happy to rely on the position that when you take public, private information and make it public that that is content, that is creation of content, that is changing the nature of the information. That is our position and if your honors were to disagree with that in some other case, that wouldn't be our fight. We certainly, I mean, because you have to understand our entire mission is to make already public records easily accessible for folks so people don't have to go down to the courthouse, you know, and so we certainly do not want to be advocating in court any sort of position where folks who are taking, doing the opposite of what we're doing, taking private information, putting it out there, are somehow seeking 230 protection. Our entire business model is to make information that the people already have the right to have, searchable and more easily accessible so everyone doesn't have to do what our runners do and go into individual courthouse and search for the, or go on each individual court website and search for the records. If you're able to prevail that you're not covered by the Fair Credit Reporting Act based on what y'all do, why are you so worried that we might say the nature of the claim doesn't relate to whether you're a publisher or not? I mean, it seems like you got this great argument that they're just, you know, they're way off base with the claims they're making. You don't, that statute doesn't apply to you in the first place. Two answers, Your Honor. One with regard to us. Nemitz says that this is an issue of immunity and it needs to be decided up front before we have to do the burdens of discovery and things of that sort. But second, you know, I'm advocating to the court what your honors decide will set the precedent for the Fourth Circuit. And I just don't see any way out of the consequence of their position. If in fact your honors rule that you can impose a suite of onerous regulations on an online database of public records, then states can ratchet that up even more. And of course you can tell Twitter or Facebook or AOL or any message board, if anyone posts anything on your website, all you have to do is do FCRA-like things. You've got to go find the person that the tweet was about. You've got to email them certain information. That is a logical unavoidable consequence of that aspect of their argument, which is why I'm urging your honors not to go down that path because that is truly dangerous to the internet. And you know we see the hostility towards Facebook, Twitter that's out there in the political sphere. If this kind of loaded gun can be out there, you can put any regulation on an interactive computer service you want, as long as you don't change the content of what they're posting. For the privilege of being a search engine that has online that is online, you have to apply X, Y, Z then it's open season on any interactive service provider that would in fact have an online searchable database or anything else I suppose. Is it your view that to address your entitlement to immunity that it's unnecessary to have a factual determination or a mixed question of fact and law that you are a consumer reporting agency? Because if you're not I think as Judge Richardson's questions indicated this goes away, correct? That's correct your honor, but I mean as this court has held, section 230 is a predicate immunity issue. So I think what I would say what I said to We may have said that there's some language that certainly uses immunity terms in a lot of courts and I was a little surprised that your colleagues talked about that. I mean C1 doesn't say anything about immunity. C1 doesn't say anything about no civil liability and Congress clearly knew how to do that by the way they drafted C2 so what it really says you won't be treated as a publisher and you know I mean we gotta deal with our precedent and maybe our precedent does characterize that as an immunity that you look at on the front end but I mean it's not what the statute says. I mean your honor we're unbinding for a circuit precedent here. I mean I don't think Nemet could be clear on this. It was quite emphatic about this and in fact Nemet is the broadest section 230 decision. This court is the one that has that there might be some other courts that take some other positions but it is an immunity issue. It needs to be decided as a threshold matter. You had factually developed record there that you don't have here I believe Nemet was a motion to dismiss You had more facts than you've got in this case. And your honors if your honors rule against us on that third much more narrow fact bound argument and send it back. We're happy to prove up. It will be not too difficult to prove up that all we are is an online searchable database of already public records and we will prevail on that. Can I just ask one follow up question to help me understand how you're thinking about this You distinguish I'm less concerned about the cases. I don't understand how you're thinking about it. How do you distinguish or identify what the gravamen of a claim is right? You've suggested that that case is different because the gravamen there was selling defective products but here it's not about your status as an agency for our purposes right now but instead about your individual speech. But how do I tell that? What is the test that you think we should look at to identify what the gravamen of the particular claim is? I mean there isn't a we don't have a full taxonomy but here we have a if the understanding of the FCRA is correct then the FCRA is a suite of regulations that anyone that wants to publish an online searchable database needs to comply with. That is core regulation of somebody as a publisher What happened in Erie was it might have been but for but it was largely incidental. The gravamen of that claim was selling defective products. Here the gravamen of the claim is how dare you, public data, go find already public documents and put them into an online searchable database. Thank you. Alright thank you very much we appreciate your argument. Ms. Bennett you've got some time left in rebuttal. Thank you. I just want to make... If you don't mind can you start with that? With the question and you can take your mask off if you want to I know we all forget. Can you start with that question? Why we should think the gravamen of this case is not the publishing where he says that what we have here the FCRA is a suite of regulations that anyone asking to engage in publishing must comply with. So why then why is he wrong? Sure so there are really three reasons and I touched on these at the end but the first reason is what Zarin says you asked how do you identify the gravamen of a claim that is subject to 230 and Zarin gives us that answer Zarin says that section 230 immunizes section 230 doesn't use the word immunity but what this court's case law has said is an immunity so I'll use that word even though I agree with you that's a difficult way of interpreting the statute but what Zarin says is what you have immunity for is the exercise of traditional publishing functions and that has a few reasons one it tells us what those functions are and public data doesn't disagree with this it concedes this on page 21 of its brief those traditional functions are deciding whether to publish not publish or edit third party content none of those apply here so if you look at Zarin itself it was editing or deciding to publish things that AOL users wanted to put on the internet if you look at Nemet it was deciding to publish or edit things that the users of consumer affairs.com wanted to put on the internet so both the function here is different nothing is saying you have to publish or not publish or edit something and nobody is saying you have to publish or not publish or edit something third parties want to put on the internet or third parties want to publish in the New York Times and the third thing I'll note is I think it's worth thinking about the type of publication that's at issue here because I think it bolsters this idea of what 230 is really getting at if you look at Zarin if you look at Nemet what we're talking about is distribution to the public of information that people wanted to be distributed to the public here we're talking about publication only in the most technical hyper legal sense in that you can only transmit data through a publication they're not putting this data on their website for anybody to access they're selling it to individual people privately that is a very different kind of publication and it's what we would typically think of as a publisher nobody says I think I understand those three points I thought what you were going to come back and say is something different and I want to just see why isn't it because it's the status of engaging in that business right that it's not you have to do these things in order to publish but it's instead you have to do these things if you're going to engage in the business of being a consumer reporting agency and that because that's one step removed from publishing the Graviman is not about publishing but is in fact the business of gathering or assembling information I think that's exactly right and I think those are related points but that's completely right you know the New York Times is engaged in the business of publishing but the public data is engaged in the business of selling consumer data and that is a different function that's the only reason the FCRA imposes liability is because it's engaged in that business and if you look at you know for example the roommates.com case I think is very helpful here and it says look what Congress wasn't trying to do wasn't trying to shield people from the law just because they operate online you know public data admits that if they sold this data by mail they would be subject to the FCRA there's no reason to think that just because they're doing it online they suddenly have immunity the goal of section 230 is to place the liability where it belongs not to change what the law actually says so here it is public data that is compiling these background reports it is public data that is choosing to sell them over the internet it's not the Maryland courts or the Texas DMV and section 230 says well we put the liability where it belongs here that's squarely public data and that's true whether you look at the prong that's about treating it as a publisher it's true whether you look at the creation or development public data is solely responsible for the illegality here not just materially contribute solely responsible for what's alleged here and I want to take a step back and make two more brief points the first is on provided by so public data said that the only case that deals with this is Ben Ezra in fact Ben Ezra doesn't deal with this but the case that does squarely deal with this is the Batzel case from the 9th circuit and that was a case where a listserv provider got an email privately that said that accused someone of having Nazi art and what the court said is whether you have immunity for publishing that email that you got privately depends on whether it was given to you in your role as the provider of an interactive computer service and that makes sense based on the text and the structure of the statute the statute doesn't say any time you get something from third parties you can publish it online and have immunity what it says is if you are a user or a provider of an interactive computer service it focuses on those roles you should not be treated as the publisher of information that is information on the internet provided by someone else and so I would urge you to look at that Batzel case I think that's very helpful here so you would disagree I think based on that you'd disagree with Judge Quattlebaum's non-disclosure argument you too would say that is not protected by C1 because that's private information that's turning public yes I think there are several problems with the non-disclosure agreement there are several reasons they wouldn't get 230 immunity for that the first is I don't think a non-disclosure a claim based on breach of non-disclosure treats someone as a publisher that is the Doe case Doe v. Internet Brands it's also the Barnes v. Yahoo case from the Ninth Circuit the second reason is that I do think you would have at least developed the information you have materially contributed to what makes that information illegal by disclosing it and the third is presumably if you publish something online that is subject to a non-disclosure agreement it was not given to you for the purpose of putting it online so it would also violate the provided by requirement and I just want to step back there's a lot of talk about consequences and I want to make very quickly two points on that if possible one is to talk about the consequences of allowing people to publish anything online just because they got it from a third party that would mean if I work in a hospital that got medical records from another doctor I could publish them online I obtained them from a third party it was provided by a third party or if I happen to have a friend who's a New York Times reporter and I send a private email that says or a Supreme Court opinion I apologize or a Supreme Court opinion I send a Supreme Court I'm a clerk for the Supreme Court and I send a private email to my friend at the New York Times that says hey look what's happening look what I got and then the New York Times decides to publish it you know maybe it's fake maybe they know it's fake and yet they publish it anyway under public data's argument they would be immune from doing so as long as they did it online that can't be what the law is and that's not what 230 says on the other hand there are no negative consequences for saying if you choose to publish something online you're liable for that you know all of the concern about well states are going to over regulate information online that's dealt with by the first amendment the same rules apply to what states can regulate online as offline so I just want to make clear this case has nothing like Zarin or Nemet or any of the cases that this court or any other court of appeals that I'm aware of has awarded section 230 immunity. You have a final thought for us? Yes your honor that's the final thought that this case is unlike any other case that I'm aware of in which a court of appeals has awarded immunity because all of those cases are talking about immunity for claims for information that someone else chose to publish on the internet. That's not what's going on here and for that reason public data does not deserve immunity. Thank you. Well we thank counsel for their argument here as you can see we're not able to come down and greet counsel in person as is our tradition so we hope we'll have that opportunity in the future so with that I'll ask the clerk to adjourn us for the day.
judges: G. Steven Agee, Julius N. Richardson, A. Marvin Quattlebaum Jr.